

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

15 MAR -6  PM 2: 25

UNITED STATES OF AMERICA EX REL.
CINDY FLICK,

    Plaintiff,

    v.

AGENDIA, INC. and MERCY HEALTH
PARTNERS – LOURDES, INC.,

    Defendants.

Case No.  5:15CV-50-TBR

**FILED IN CAMERA AND
UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)**

JURY TRIAL DEMANDED

## COMPLAINT OF QUI TAM PLAINTIFF/RELATOR
## FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*

## NATURE OF THE CASE

1.    This lawsuit on behalf of the United States under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and the Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b (the "Anti-Kickback Statute") seeks to recover millions of dollars in reimbursed Medicare Part B claims that were fraudulently submitted by independent clinical laboratory Agendia, Inc. with the help and cooperation of hospitals around the country, including Lourdes Hospital.

2.    Agendia markets a proprietary genetic assay called MammaPrint that ostensibly predicts the risk of cancer recurrence in breast-cancer patients. Physicians extract cancerous breast tissue during hospital procedures and send it to Agendia's laboratory in Irvine, California for testing. Under the governing Medicare reimbursement rules, Agendia must bill the hospital for the assay, and the hospital must in turn seek reimbursement from its local Medicare contractor.

3.    During the relevant period, the overwhelming majority of Medicare contractors did not reimburse stand-alone claims for the MammaPrint assay because they concluded that it was investigational and not medically necessary. Until September 2013, Agendia's local Medicare contractor in California happened to be the only one that regularly reimbursed stand-alone claims for the MammaPrint assay under Medicare Part B.

4.    To circumvent the governing Medicare reimbursement rules and induce physicians and hospitals to order the MammaPrint assay for Medicare patients, Agendia implemented a marketing scheme whereby it (1) offered to provide the MammaPrint assay (and others) to hospitals free of charge,  in violation of the federal Anti-Kickback Statute; (2) instructed hospitals to artificially delay ordering the MammaPrint assay for 14 days after patient discharge in order to circumvent Medicare date-of-service regulations and thereby artificially unbundle the assay from the hospital procedure; and (3) submitted legally false claims under Medicare Part B to its local Medicare contractor in California, where those claims were reimbursed.

1

5.      The United States has reimbursed over $10,000,000 as a result of the legally false claims submitted by Agendia. But for Agendia's misconduct in violation of the False Claims Act and the Anti-Kickback Statute, the United States would not have reimbursed these claims for Agendia's MammaPrint assay.

6.      Relator Cindy Flick discovered Agendia's misconduct first-hand in 2013 when she worked as a Laboratory Section Supervisor at Lourdes Hospital. In that role, she learned that Agendia's sales representatives were instructing doctors and pathology employees to artificially delay assay orders by 14 days. Even though Lourdes's doctors were ordering Agendia's assays the day of surgery, the orders were not "officially" placed until 14 days after patient discharge, which allowed Agendia, rather than the hospital, to bill its local contractor in California.

7.      Relator also discovered the improper inducements Agendia was offering to doctors for their cooperation, including providing free additional assays if doctors ordered MammaPrint, for which Agendia was reimbursed roughly $3,400 per assay. In fact, Relator witnessed first-hand Lourdes's solicitation of free services from Agendia, as well as the fact that Lourdes had already received thousands of dollars in free Agendia testing.

8.      After Relator brought this misconduct—which implicated one of her direct superiors—to the attention of the hospital's compliance officers and executives, the hospital fired her for the pretextual reason of insubordination, despite her pristine employment record. That wrongful termination is now the subject of Relator's separate lawsuit against Lourdes Hospital pending in the United States District Court for the Western District of Kentucky.

## PARTIES

9.      Relator Cindy Flick is a natural person and is a citizen and resident of the State of Illinois. She brings this action on behalf of the United States of America under the False Claims Act, 31 U.S.C. § 3729 *et seq.* Relator has direct and independent knowledge of the information on which

2

the allegations in this complaint are based. She is an original source of information given to the United States regarding Defendants' knowing pursuit of illegal conduct in violation of federal laws and regulations that resulted in the payment of fraudulent claims.

10.     Defendant Agendia, Inc. is a corporation organized under Delaware law, with its principal place of business and corporate nerve center located in Irvine, California. Agendia's head-quarters are located at 22 Morgan, Irvine, CA 92618.

11.     Defendant Mercy Health Partners – Lourdes, Inc. ("Lourdes Hospital") is a hospital operating in Paducah, Kentucky under the sponsorship and supervision of Mercy Health Partners— a non-for-profit, Catholic health organization. Lourdes Hospital is located at 1530 Lone Oak Rd., Paducah, KY 42003.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this dispute under 28 U.S.C § 1331 and § 1345.

13.     This Court has personal jurisdiction over Agendia because it regularly conducts business in the State of Kentucky, including within the Western District of Kentucky, by marketing its products and services to both consumers and healthcare providers within this State.

14.     This Court has personal jurisdiction over Lourdes Hospital because its principal place of business is within the State of Kentucky and within this judicial district.

15.     Venue in this judicial district is proper under 31 U.S.C. § 3732(a) because both Agendia and Lourdes Hospital transact business in, and can be found within, the district.

## FACTUAL ALLEGATIONS

**1.      Background on the federal Medicare program.**

16.      Medicare is a United-States-government-sponsored health insurance program for people age 65 or older, people with certain disabilities, and people with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A.

17.      The Medicare program is generally divided into two parts: Part A, which covers inpatient care at hospitals and skilled nursing facilities; and Part B, which covers physician services, outpatient care, and medically necessary laboratory tests. *See* 42 U.S.C. §§ 1395c-1395i-4.

18.      Medicare is not permitted to pay for any expense that is not "reasonable and necessary for the diagnosis and treatment of illness or injury." 42 U.S.C. § 1395(a)(1)(a).

19.      The Medicare program is administered under the auspices of the Centers for Medicare and Medicaid Services ("CMS") through a series of privately owned financial intermediaries called Medicare Administrative Contractors ("MACs"), which are responsible for handling and reimbursing claims under Medicare Parts A and B within exclusive geographic regions of the United States assigned to them by CMS.

20.      Healthcare providers who service patients on Medicare are responsible for submitting claims for reimbursement to the geographically appropriate MAC.

21.      Claims for certain types of healthcare products or services are subject to National Coverage Determinations that apply on a national basis for all Medicare beneficiaries. But many coverage decisions are made by MACs at the local level through Local Coverage Determinations.

**2.      Background on Agendia and MammaPrint.**

22.      Agendia is an independent clinical laboratory based in Irvine, California that markets several proprietary genetic assays for breast-cancer patients, including its flagship assay MammaPrint. Agendia markets MammaPrint as both a stand-alone assay and as a component of a

comprehensive genetic panel called Symphony, which also includes Agendia's BluePrint and TargetPrint assays.

23.     The MammaPrint cancer recurrence assay evaluates certain genetic components of breast-cancer tissue that is surgically extracted from patients, either during inpatient procedures at hospitals, or during hospital outpatient procedures such as tissue biopsies.

24.     Doctors treating breast-cancer patients extract, preserve, and deliver untreated tumor specimens to Agendia's laboratories in Irvine, California, where the specimens are analyzed via the MammaPrint assay.

25.     Using a proprietary algorithm, MammaPrint yields a numerical index that classifies patients as having a high or low risk of breast-cancer recurrence.

26.     Although MammaPrint was approved by the Food and Drug Administration ("FDA") in 2007, it is nevertheless still considered investigational for the prognosis of breast cancer recurrence, and is of dubious clinical value.

27.     According to the National Institute of Health and Care Excellence, MammaPrint and tests like it "are not recommended for general use in [patients] because of uncertainty about their overall clinical benefit and consequently their cost effectiveness."

28.     Health Net's National Medical Policies, updated in May 2014, note that "[i]t has not been shown in studies or clinical trials up to this point, that MammaPrint improves outcomes beyond what is currently available through clinical, histological and pathological means." "Although MammaPrint may offer prognostic information beyond that offered by standard tools, the clinical utility of the MammaPrint assay has not been defined and there lacks evidence demonstrating that the use of MammaPrint would influence clinical decision making regarding adjuvant therapy and/or improve outcomes."

29.     The California Technology Assessment Forum for MammaPrint concluded in June 2010 that MammaPrint "does not meet technology assessment criterion 3 (i.e., technology must improve the net health outcomes); criterion 4 (i.e., technology must be as beneficial as any established alternatives) and criterion 5 (i.e., improvement must be attainable outside the investigational setting)."

30.     Given the absence of sufficient evidence supporting its value in treating breast cancer, MammaPrint is not included in the treatment guidelines issued by the National Comprehensive Cancer Network or the American Society of Clinical Oncology, both of which develop research-based guidelines on industry-standard approaches to the treatment of breast cancer.

**3.     Background on Medicare reimbursement for independent laboratory tests.**

31.     Under governing Medicare regulations, when healthcare providers order laboratory tests or pathology tests from an independent laboratory for hospital patients—either inpatient or outpatient—the hospital must pay the laboratory directly for the cost of the test and subsequently seek reimbursement from their local Medicare contractor. *See, e.g.,* Medicare Claims Processing Manual, Chapter 16 – Laboratory Services, § 40.3.

32.     Costs incurred during hospital inpatient treatment are reimbursed under Medicare Part A. Under Part A, hospitals contract with Medicare to provide inpatient treatment at certain predetermined rates for specific diagnosis-related groups ("DRGs") and to accept those rates as payment in full—notwithstanding the actual costs associated with the treatment. *See* 42 U.S.C. § 1395ww; 42 C.F.R. §§ 412.1, 412.20, 412.60. These predetermined rates are referred to as the inpatient prospective payment system ("IPPS"). Laboratory tests that are ordered during inpatient treatment, if any, are reimbursed only by the flat IPPS rate.

33.     For tests ordered during outpatient treatment, healthcare providers must seek reimbursement under Medicare Part B. Under Part B, there are likewise predetermined, agreed-to reim-

6

bursement rates for specific outpatient procedures and laboratory tests, though there is not a flat or a maximum rate for what can be reimbursed on any given visit. Starting in January 2014, certain hospitals were required to switch to an outpatient prospective payment system ("OPPS"). Some laboratory tests are covered as part the pre-determined OPPS rate, while others can be submitted as stand-alone claims.

34.     If a laboratory test is ordered during an inpatient procedure, the cost of that test is not separately reimbursed, but is part of the predetermined IPPS flat rate. Thus, ordering a laboratory test for hospital inpatients increases the hospital's cost of treatment without increasing the Medicare reimbursement amount—thereby decreasing the hospital's profit for treating the patient (or, alternatively, increasing the hospital's loss).

35.     Before January 2014, if a laboratory test was ordered during a hospital outpatient procedure, the cost of that test was separately billed by the hospital to its local MAC, and reimbursement depended largely on whether the MAC had issued a favorable Local Coverage Determination. Starting in January 2014, some lab tests have been bundled with the OPPS rate, while others have not.

**4.     Background on Medicare reimbursement for MammaPrint.**

36.     There have been no National Coverage Determinations with respect to MammaPrint. Thus, whether the cost of the MammaPrint assay will be reimbursed under Medicare Part B largely depends on whether there is an applicable Local Coverage Determination.

37.     The FDA first approved the MammaPrint assay in 2007. Importantly, MammaPrint was only FDA-approved for testing on "fresh" or "fresh frozen" tumor specimens due to doubts about the reliability of genetic testing on specimens preserved via other means, including the Formalin Fixed Paraffin Embedded ("FFPE") method.

7

38.     The first, and until recently, only, MAC to approve MammaPrint for stand-alone re-imbursement under Medicare Part B was Palmetto GBA, which was the MAC responsible for California, Agendia's home state, in 2009.

39.     On the "Company Overview" section of its website, Agendia touts that "[i]n 2009, a significant landmark in our commercial development was our positive local coverage determination by the Medicare carrier in California which processes all of our Medicare reimbursement claims."[1]

40.     While the positive Local Coverage Determination for MammaPrint did not identify an appropriate method for specimen preservation, as of 2009, MammaPrint was FDA-approved only for fresh or fresh frozen tumor specimens, and there was no clinical evidence supporting the use of MammaPrint on specimens preserved via FFPE.

41.     FDA approval is one of the main criteria that MACs take into account when issuing Local Coverage Determinations. Healthcare products or services that have not been FDA-approved are much less likely to receive favorable Local Coverage Determinations. When a covered service can be administered in a manner that is either FDA-approved or not-approved, an assumption of coverage is that the service will be administered in the FDA-approved manner.

42.     In 2011, Palmetto GBA developed a stand-alone reimbursement program specifically for molecular diagnostic tests named "MolDX." MammaPrint was included as a covered test under the MolDX program.

43.     In September 2013, CMS reassigned Palmetto GBA to a different jurisdiction. Another MAC—Noridian Healthcare Solutions—took over the jurisdiction covering California, Agendia's home state.

44.     While Noridian had not previously issued a positive Local Coverage Determination for MammaPrint, it decided to defer reimbursement decisions for molecular diagnostic tests to the

---

[1] http://www.agendia.com/about/company-overview/ (last visited on March 3, 2015).

MolDX contractor. Thus, by default, in September 2013 Noridian became the second MAC to re-imburse stand-alone claims for MammaPrint under Medicare Part B.

45.     The other MACs, including the Medicare Part B contractor assigned to Kentucky—CGS Administrators, LLC—did not issue any favorable Local Coverage Determinations for MammaPrint between 2009 and late 2014.

46.     Indeed, one MAC—First Coast Service Options, Inc.—has issued a Local Coverage Determination specifically rejecting claims for the MammaPrint assay, noting that its use "as a technique of managing the treatment of breast cancer is considered investigational and not medically necessary" given other available options. First Coast is the MAC responsible for Florida, which is home to the second-largest number of Medicare beneficiaries (roughly 3.5 million) of any State.

47.     Notably, neither of the other genetic breast-cancer assays Agendia markets as part of the Symphony panel—BluePrint and TargetPrint—has received a favorable Local Coverage Determination anywhere in the country. Thus, both of those assays are considered not medically necessary for the treatment of breast cancer, and Medicare claims for these two assays are routinely denied.

**5.     The obstacles to Agendia's marketing of MammaPrint to the lucrative Medicare-beneficiary population.**

48.     Over half of all breast-cancer diagnoses occur in women over age 65—the qualifying age to become a Medicare beneficiary. Thus, the Medicare-beneficiary population represents a critical target market for Agendia's MammaPrint assay, as well as its other breast-cancer assays BluePrint and TargetPrint.

49.     As noted above, breast-cancer tissue analyzed using the MammaPrint assay is surgically extracted either during hospital inpatient procedures, or hospital outpatient procedures such as tissue biopsies.

50.     Regardless of whether reimbursement for MammaPrint is sought under Medicare Part A (inpatient) or B (outpatient), under operative Medicare policies, the claim would have to be filed by the hospital with its local MAC.

51.     Despite convincing its local MAC in California to issue a favorable Local Coverage Determination for MammaPrint in 2009, Agendia faced two major obstacles to getting physicians and hospitals to order MammaPrint for Medicare patients.

52.     **Bundled payments for inpatients under Medicare Part A.** If physicians who extracted tumor specimens from inpatients ordered MammaPrint—which in 2013 had a list price of $4,200 per test—Agendia would have to bill the hospital for the cost of the test. Whether the physician ordered MammaPrint or not, the hospital would receive the same flat rate under the hospital IPPS. Thus, ordering MammaPrint would reduce the hospital's profit (or increase the hospital's loss) for treating an inpatient by thousands of dollars.

53.     As a consequence—and combined with the fact that MammaPrint is not part of the standard of care for treating breast-cancer patients and has dubious utility in aiding treatment decisions—physicians and hospitals were highly reluctant to incur the substantial additional expense associated with ordering MammaPrint for Medicare inpatients.

54.     **Claim denial for outpatients under Medicare Part B.** Following Palmetto GBA's favorable Local Coverage Determination for MammaPrint in 2009, it was the only MAC that reimbursed stand-alone claims for MammaPrint under Medicare Part B. At the time, Palmetto GBA was assigned to jurisdictions E and J, which encompassed the following states: California, Hawaii, Nevada, Washington, Oregon, Wyoming, North Dakota, South Dakota, Idaho, Montana, Utah, Arizona, and Alaska.

55.     Putting aside MammaPrint's dubious utility in making treatment decisions, physicians and hospitals treating outpatients in jurisdictions other than E and J were highly reluctant to order

10

MammaPrint because they knew that their local MACs had not issued favorable Local Coverage Determinations for MammaPrint, meaning the assay would likely not be reimbursed under Medicare Part B. Thus, after paying Agendia the hefty price tag for MammaPrint, the hospital would either have to attempt to recover those costs directly from the Medicare patient, or simply write those costs off.

56.     In September 2013, Noridian replaced Palmetto GBA as the MAC assigned to jurisdictions E and J and became only the second MAC to cover MammaPrint by deferring to Palmetto GBA's MolDX program on coverage decisions for molecular diagnostic tests. Palmetto GBA, in turn, was reassigned to jurisdiction 11, which encompasses the following states: North Carolina, South Carolina, Virginia, and West Virginia.

**6.     Agendia's scheme to circumvent Medicare reimbursement rules and to submit false claims for the MammaPrint assay.**

57.     Faced with the two major obstacles described above—which threatened not only the use of MammaPrint in the lucrative Medicare-beneficiary population, but also the broader adoption of MammaPrint among physicians and hospitals—Agendia devised a marketing scheme to artificially unbundle the costs of the MammaPrint assay from IPPS payments under Medicare Part A and to redirect claims for MammaPrint to the only MAC that reimbursed them under Medicare Part B.

58.     To ensure that hospitals bill Medicare for laboratory tests ordered for hospital inpatients and outpatients, as well as to ensure that the costs of those tests are bundled with the rest of the inpatient treatment under IPPS, Medicare regulations state "that the date of service of the test must be the date the specimen was collected," rather than the date the test was actually performed. 42 C.F.R. § 414.510(a); *see also* Medicare Claims Processing Manual Chapter 16 – Laboratory Service, § 40.8. This is commonly referred to as the laboratory date-of-service rule.

11

59.     There is an exception to this date-of-service rule, however, for archived specimens that are collected during a hospital procedure and stored for possible future testing. The exception applies only if "(A) The test is ordered by the patient's physician at least 14 days following the date of the patient's discharge from the hospital; (B) The specimen was collected while the patient was undergoing a hospital surgical procedure; (C) It would be medically inappropriate to have collected the sample other than during the hospital procedure for which the patient was admitted; (D) The results of the test do not guide treatment provided during the hospital stay; and (E) The test was reasonable and medically necessary for the treatment of an illness." 42 C.F.R. § 414.510(b)(2)(i).

60.     This exception is commonly referred to as "the 14-day rule." The rationale behind the 14-day rule is that, if a specimen is collected as part of a hospital procedure but is stored, rather than sent for testing by the physician performing the procedure, then any testing that is later ordered on that specimen is not part of the care provided during the hospital procedure.

61.     The 14-day period represents an assumption by CMS that a laboratory test that is related to a hospital procedure would be ordered immediately after collection, but almost certainly within 14 days of patient discharge. On the other hand, any test ordered on an archived specimen more than 14 days after discharge would almost certainly be an event separate from the hospital procedure.

62.     As CMS noted in its final rulemaking on the 14-day rule, "We remain very concerned that only tests that can legitimately be distinguished from the care a beneficiary receives in the hospital be subject to this provision regarding the date of service of the test, which results in separate payment for the test. We believe it is more difficult to determine that a test ordered less than 14 days before discharge is appropriately separable from the hospital stay that preceded the test." 71 FR 69624-01 at 69706.

12

63.     There are two important consequences of the 14-day rule. First, for specimens ex-
tracted during inpatient procedures, claims for reimbursement are unbundled from the IPPS rate
under Medicare Part A, and result in a separate claim under Medicare Part B. Second, the laboratory
performing the test, rather than the hospital where the specimen was collected, gets to submit the
claim for reimbursement to its local MAC.

64.     Recognizing that the 14-day rule created an opportunity to overcome both of the ob-
stacles it faced in getting doctors to order MammaPrint for Medicare patients, Agendia instructed its
sales representatives to encourage doctors and hospitals to artificially delay ordering MammaPrint
until 14 days after patient discharge, even though the decision to order MammaPrint was made be-
fore, during, or immediately after the underlying hospital procedure.

65.     The order could be artificially delayed in several ways. The hospital could hold on to
the specimen until 14 days after patient discharge and only then send it to Agendia's laboratory in
California for testing. Alternatively, the hospital could send the specimen to Agendia right away, and
then follow up with an official physician signature ordering the test 14 days after patient discharge.

66.     Indeed, Agendia's standardized Breast Cancer Gene Profile Request Form had a
built-in option where the requesting physician could check the "Send and Hold" box next to the
menu of available assays, which would not constitute an order under the Medicare date-of-service
rules. Then 14 days after patient discharge, the hospital would deliver to Agendia the physician's sig-
nature officially ordering the MammaPrint assay.

67.     Notably, delaying specimen testing by 14 days required extended storage, which led
hospitals to preserve the specimen using the FFPE method, rather than the fresh frozen method.
Storing and transporting FFPE-preserved specimens is more cost-effective than storing and trans-
porting fresh-frozen samples, which must be housed in dry ice.

68.     As noted above, however, FFPE is an inferior form of preservation for purposes of genetic testing, and MammaPrint was not FDA-approved for FFPE-preserved specimens until February 2015.

69.     For inpatients, Agendia's marketing scheme allowed doctors not only to receive the benefit of the information provided by the MammaPrint assay, but it also allowed hospitals to collect the flat IPPS payment without incurring the $4,200 cost of the assay—significantly increasing the profitability of the inpatient treatment. In essence, doctors treating Medicare patients obtained MammaPrint for free.

70.     For outpatients, Agendia's marketing scheme likewise allowed doctors to obtain MammaPrint for free, while re-directing reimbursement claims from MACs that would likely have denied the claim as not medically necessary, to the only MAC (until late 2013) that had issued a favorable Local Coverage Determination. Had these claims for reimbursement not been re-directed to the MAC responsible for Agendia's home state (California), hospitals would have been required to either seek payment from Medicare patients, or simply to write off the costs.

71.     As a further inducement to doctors and hospitals to order MammaPrint for Medicare patients, and to artificially delay doing so until 14 days after patient discharge, Agendia also offered to provide the other breast-cancer assays in its Symphony panel—BluePrint and TargetPrint—free of charge. Combined, these two assays had a list price of over $5,100, making the list price for the Symphony panel over $9,300.

72.     Agendia encouraged doctors to order the entire Symphony panel even though MammaPrint was the only assay reimbursed by Agendia's local MAC. Agendia thus offered these additional services to doctors free of charge with the understanding that it would have to write off the costs of BluePrint and TargetPrint. The marginal cost of these two assays was low enough, and

14

the reimbursement rate for MammaPrint high enough (roughly $3,400 per test), that taking a loss on the written-off assays was still profitable as long as MammaPrint was reimbursed.

73.     Moreover, increasing the number of BluePrint and TargetPrint orders and Medicare claim denials had the additional benefit of making it appear that there was a genuine demand for the assays among doctors. And because MACs make Local Coverage Determinations based in part on the available data for physician demand for certain healthcare products or services—which may be used as evidence supporting medical necessity and clinical utility—ramping up the number of Blue-Print and TargetPrint orders among doctors improved Agendia's chances of winning favorable coverage determinations in the future.

74.     Inducing doctors and hospitals to artificially delay ordering the MammaPrint assay for Medicare patients allowed Agendia to dramatically increase MammaPrint's marketability in the Medicare-beneficiary population. On its website, Agendia touts MammaPrint as "the fastest growing breast cancer recurrence assay."[2]

75.     As a direct result of Agendia's marketing scheme, the United States ultimately reimbursed millions of dollars for medically unnecessary tests that either should not have been reimbursed at all (for outpatients in jurisdictions without a favorable Local Coverage Determination), or that should not have been separately reimbursed apart from the flat IPPS payment (for all inpatients). In 2012 alone, Medicare paid over $3,000,000 for MammaPrint under Medicare Part B directly to Agendia.[3]

---

[2] http://www.agendia.com/about/company-overview/ (last visited on March 3, 2015).

[3] This figure was derived from the "Medicare Provider Utilization and Payment Data: Physician and Other Supplier," which was made public for the year 2012 only in 2014 (available at http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier.html). The data for later years has not been made public.

**7.    Relator's discovery of Agendia's scheme.**

76.    Relator Cindy Flick began working for Lourdes Hospital as Laboratory Section Supervisor in 2011. In that role, she was responsible for Reference Lab Testing, the Microbiology Department, Quality Assurance, Safety, and various aspects of laboratory billing and coding.

77.    Relator's first professional exposure to Agendia while at Lourdes Hospital took place in March 2013, when pathology secretary Debra Thomason brought to Relator's attention a significant outstanding bill due to Agendia for assays ordered for Medicare outpatients in late 2012 and early 2013.

78.    The charges were for the full Symphony panel of Agendia's genetic assays on breast-cancer tissue—including MammaPrint, BluePrint, and TargetPrint—and were roughly $9,300 per patient. (*See* Ex. 1, 3.3.1.2013 Agendia Invoice.) According to Thomason, the hospital had not received Medicare reimbursement for these charges, it had not billed the patients, and it was also not paying Agendia's invoice.

79.    When Relator investigated the circumstances behind the outstanding charges, she discovered that claims for reimbursement of the entire Symphony panel had been submitted for four patients to Lourdes's local MAC—CGS Administrators—but had been denied.

80.    The claims were submitted using the CPT code 84999 (Unlisted Chemistry Procedure), per the coding instructions provided by Agendia. Agendia's local MAC—Palmetto GBA—had instructed Agendia to submit claims for MammaPrint using the same generic code.[4]

81.    Relator then inquired about why Lourdes's doctors were ordering $9,300+ assays for Medicare patients when its local MAC was denying claims for those assays.

---

[4] Notably, Relator has first-hand knowledge that specimens Lourdes sent to Agendia for testing were preserved using the FFPE method, which was not FDA-approved for MammaPrint until February 2015. Thus, at the time Agendia performed testing on Lourdes specimens during Relator's employment at Lourdes, those tests were not FDA-approved tests.

16

82.     Pathology employee Kemmerli Crass informed Relator that the hospital's standard operating procedure with respect to Agendia tests for Medicare patients had been to send the specimen to Agendia with instructions to hold, and to follow up 14 days after patient discharge with a signed physician order indicating the tests to be performed.

83.     Crass showed Relator copies of pre-signed but otherwise blank Agendia requisitions signed by Daniel Howard, M.D. to be used specifically for the purpose of the 14 day follow-up order. The standardized forms had a pre-printed option labeled "send and hold" next to the menu of available Agendia tests.

84.     Crass also explained that the pathology staff were instructed to delay placing an "official" order for Agendia tests until 14 days after patient discharge, even though the orders had been specifically requested by a physician at the time of hospital treatment, or immediately thereafter.

85.     Crass informed Relator that Agendia oncology sales specialist Brock Smith had made arrangements with Relator's boss—Laboratory Director Mohammad Khan—to direct the pathology staff to artificially delay orders for Agendia's tests on Medicare patients, and that Smith himself had instructed the pathology staff to delay orders by 14 days to avoid Agendia having to bill the hospital.

86.     Relator subsequently requested and obtained a copy of the Agendia requisition from Debra Thomason, the pathology secretary. The blank requisition was already signed by one of the physicians, but the signature had been partially whited-out before Relator received a copy. The date had yet to be filled in. (*See* Ex. 2, Pre-Signed Agendia Requisition.)

87.     Thomason informed Relator that she was uncomfortable with the practice of delaying the orders by 14 days because Dr. Howard was making written requests for the Agendia tests on the day of surgery. Pathology staff were instructed to wait 14 days to date the requisition and to deliver the order to Agendia.

17

88. Thus, although Agendia did not receive the official order for 14 days after patient discharge, the decision to place the order, and the physician signature required to make the order official, were both complete at the time of the underlying hospital procedure, or shortly thereafter.

89. After reviewing the Medicare Claims Manual for the date-of-service requirement and the 14-day rule, Relator recognized that Agendia's and Lourdes's scheme was an attempt to artificially unbundle Agendia's laboratory tests from the underlying hospital procedure, to circumvent the date-of-service requirement, and to enable Agendia to submit stand-alone claims under Medicare Part B to its local MAC.

90. Relator's suspicion was only reinforced by a conversation she had with Agendia employee Donna Carver. Relator recognized that Lourdes's physicians were consistently ordering Agendia's entire Symphony panel, which consisted of not only MammaPrint, but also BluePrint and TargetPrint. And while MammaPrint had received a favorable Local Coverage Determination from Agendia's local MAC, TargetPrint and BluePrint had not—meaning that neither assay was likely to be reimbursed.

91. When a healthcare provider expects that Medicare will not cover a cost incurred during the treatment of a beneficiary, Medicare regulations require the healthcare provider who will be submitting the claim to provide the beneficiary with a form called the Advance Beneficiary Notice of Non-coverage ("ABN"). The ABN informs the beneficiary of the non-covered procedure and its cost, and gives the beneficiary the option to decline the procedure, or to accept the procedure and agree to be responsible for paying the associated cost.

92. When Relator called Agendia to determine whether Lourdes should be providing Agendia ABNs to Medicare patients for whom the entire Symphony panel was ordered—specifically with respect to the non-covered BluePrint and TargetPrint assays—she was connected to Donna

18

Carver. Carver explained that ABNs did not need to be provided, and that Agendia would simply write off any costs that were not reimbursed.

93.     Thus, in an effort to incentivize doctors and hospitals to order MammaPrint, Agendia encouraged them to order the entire Symphony panel, even though it knew that two of the tests would not be reimbursed. For doctors following the instruction to delay orders by 14 days—such as Lourdes doctors Daniel Howard, Edwin Grogan, Carolyn Watson, Gerland Weir, and Christopher Green—Agendia essentially threw in two free assays.

94.     Even though claims for those assays were not reimbursed, Agendia benefitted from submitting those claims because the claims created the appearance of genuine demand for the assays among physicians, which often influences MACs when deciding whether to issue favorable Local Coverage Determinations. In other words, Agendia used the BluePrint and TargetPrint assays as loss leaders not only so that Agendia would increase the adoption of the MammaPrint assay, but also to improve the chances of future favorable coverage decisions for the two other assays.

95.     Absent Agendia's gaming of the 14-day rule, however, doctors and hospitals would not have ordered any of Agendia's assays because they, and not Agendia, would have to suffer the immediate losses associated with denied Medicare claims, which for the Symphony panel were over $9,300 per order. Agendia, by contrast, would only lose the marginal costs of running those assays, which were a tiny fraction of the list price.

96.     After piecing together Agendia's scheme to circumvent Medicare date-of-service rules in March 2013, Relator immediately informed her direct supervisor Mohammad Khan, who had purportedly implemented the scheme at the behest of Agendia's sales representative Brock Smith. Khan denied any knowledge of the scheme, but refused to do anything to do anything to stop it.

97.    After being rebuffed by Khan, in April 2013, Relator reported the practice of artificially delaying Agendia orders for Medicare patients to Corporate Compliance Officer Elizabeth Snodgrass. Snodgrass agreed with the Relator that the practice was suspect and could raise red flags with the Office of the Inspector General ("OIG"), particularly if the staff were post-dating requisitions signed by the physician at the time of the hospital procedure. Snodgrass assured Relator that she would investigate the practice.

98.    Shortly thereafter, and at Khan's request, Relator developed a policy and a form that dealt with delayed laboratory orders. The form was called "Outpatient Referred Lab Testing Order." On that form, the ordering physician was asked to identify the requested test, the diagnosis, and the outpatient discharge date. (*See* Ex. 3, Lourdes Order Form.)

99.    The ordering physician was then asked to select one of three options: (1) "Test to be completed 14 days after patient discharge"; (2) "Tissue to be held for future testing if indicated"; (3) "Test to be completed immediately." (*Id.*) There was a designated space for the physician signature, as well as the date and time.

100.    The lower part of the form was directed to the Pathology Department, which would receive the specimen to be tested, with the following instructions: "(1) Upon discharge, prepare test requisition and obtain physician signature if testing is desired. Submit tissue for testing as indicated above. (2) If no testing is ordered at this time, archive specimen." (*Id.*)

101.    Relator's supervisor Khan made changes to the form and subsequently he and Christopher Green, MD—the Laboratory Medical Director—approved it for use. The form was used in the latter half of 2013 to order various laboratory tests, including Agendia assays.

102.    It was believed that, by signing the Lourdes internal order form at the time of the underlying procedure, the order date could legitimately be delayed for 14 days after patient discharge without violating the 14-day rule.

20

103.     Of course, when a physician completed the Lourdes form, identified the test to be performed, and signed the form, the physician had already "ordered" the test—notwithstanding the accompanying instruction to delay the requisition for 14 days following patient discharge.

104.     Similarly, when a Lourdes physician completed an Agendia requisition with instructions to "send and hold" a tumor specimen, the physician had already decided to order Agendia's genetic assays; the specific identification of the assays that followed 14 days after patient discharge was likewise designed to mask the true order date and artificially unbundle the test from the underlying hospital procedure.

105.     On April 16, 2013, Khan invited Relator to meet with two Agendia sales representatives—Mark Rayan and Renis Baker—at Lourdes Hospital to discuss a contract with a discounted fee arrangement for Agendia's genetic assays.

106.     At that meeting, the topic of the outstanding bill to Lourdes for assays performed on Medicare patients in late 2012 and early 2013 came up. In ordering those tests, Lourdes had apparently not followed the procedure prescribed by Agendia of delaying the assay order by 14 days after patient discharge. Rayan referred to those tests as ones that "slipped through the cracks."

107.     Khan insisted that Agendia should not bill Lourdes for those (or any) tests on Medicare patients, per its standard practice. The Agendia sales representatives responded that Lourdes had placed the orders for those tests within 14 days of patient discharge, so the standard arrangement could not apply.

108.     Relator explained that Lourdes's pathology staff did not feel comfortable artificially delaying orders on specimens for 14 days. Relator also explained that Lourdes would be willing to continue ordering Agendia's tests with the understanding that Lourdes would only be responsible for paying what it was able to collect from either Medicare or the patients.

21

109.    On April 18, 2013, Mark Rayan emailed Relator and Khan, thanking them for their time two days earlier, and attaching a proposed contract with a discounted fee schedule, as Khan had requested. (*See* Ex. 4, 4.18.2013 Email Exchange.) Rayan also noted that his colleague Renis Baker "visited Dr. Howard's office after our meeting"—Dr. Howard regularly ordered Agendia assays for breast-cancer patients—"and it's my understanding that we have the logistical issues worked out." (*Id.*)

110.    Relator replied to Rayan's email that same day. With respect to the outstanding invoice for assays on Medicare patients, Relator explained: "As we discussed, we are willing to pay you what we are able to get reimbursement for. We sent those specimens the day of surgery only because we questioned the legality of holding specimens for 14 days." (*Id.*)

111.    Relator received a phone call from Agendia sales representative Renis Baker on July 29, 2013. During that call, Baker informed Relator that Khan was insisting on inserting a provision into the proposed contract that would make all Agendia assays that Lourdes ordered for Medicare patients free to Lourdes. Baker emailed Relator a copy of the proposed contract the same day.

112.    Specifically, Khan had added the following clause to the proposed contract: "In addition [if] testing is ordered on inpatient or same day surgery, the Laboratory will waive the charges." (*See* Ex. 5, Proposed Agendia Contract, at 3.) Of course, the specimens tested by Agendia's assays could only be extracted during inpatient or same day (outpatient) surgery, so the clause would result in Agendia waiving its charges for all assays ordered on Medicare patients.

113.    By adding this clause, Khan attempted to memorialize in writing the informal understanding he previously reached with Agendia: that because the specimens of Medicare patients would be held 14 days before ordering, Lourdes would not have to pay anything to Agendia for assays ordered for Medicare beneficiaries. Because of the scrutiny precipitated by Relator's complaints

to the Compliance Officer, the practice of holding orders for 14 days had been curtailed, and Khan wanted free testing even without the 14 day hold.

114.     Relator sent Khan the following email on July 30, 2013: "I have a concern with section 6.4 regarding the last statement that they will waive the charge for Medicare inpatients or SDS patients. They cannot give us testing at no charge, it is the same as giving us anything else of value, it is seen as an inducement to use their lab. That statement needs to be removed." (*See* Ex. 6, 7.30.2013 Flick Email to Khan.)

115.     Later that same day, Khan visited Relator's office and expressed his anger at Relator's email. Khan explained that he was going to keep the clause in the contract because Agendia had already agreed in principal to the arrangement. According to Khan, if Agendia was doing something illegal, then it was Agendia's problem, not Lourdes's. He told Relator that the arrangement with Agendia was none of her business and that she should stop interfering.

116.     In August 2013, Agendia's Senior Director of Reimbursement Vicky Reyes contacted Relator about the still-outstanding Agendia invoice on the Medicare patients treated in late 2012 and early 2013. At this point, the invoice was overdue by more than 6 months.

117.     On August 21, 2013, Reyes emailed Relator an Excel spreadsheet listing the details for the services and patients that were the subject of the outstanding invoice. (*See* Ex. 7, 8.21-8.22.2013 Flick and Reyes Email Exchange.)

118.     Relator noticed that the charges related to two Medicare patients had been removed from the invoice: a $9,325 charge for the full Symphony panel for patient Arlene Mathis, with a date of service of July 2, 2012; and a $9,325 charge for the full Symphony panel for patient Magdalyn Colli, with a date of service of September 17, 2012. (*See* Ex. 8, Invoice with Waived Charges.)

119.     Relator emailed Reyes on August 22, 2013 to ask why the charges for patients Colli and Mathis had been waived. (*See* Ex. 7.)

23

120.    The same day, Reyes responded: "They were credited off as we felt they had fallen through our procedures thus we did not want to penalized [sic] the hospital for the charges." (*Id.*)

121.    Later on August 22, Relator had a phone conversation with Reyes where Reyes confirmed that the "procedures" she was referring to in her email was the agreed-to practice of holding the specimens of Medicare patients that Lourdes forwarded for 14 days after patient discharge. Apparently, Agendia had failed to hold the specimen for the requisite 14 days, thus resulting in a charge to Lourdes.

122.    Shortly thereafter, also in August 2013, Relator met with Jeff Jones, Vice President of Operations at Lourdes, and Khan's direct supervisor. Relator informed Jones about what she viewed to be Khan's inappropriate solicitation and acceptance of free services from Agendia, the clause Khan inserted into the proposed Agendia contract, as well as Agendia's inappropriate waiver of charges for assays on the specimens of two Medicare patients. Jones told Relator that he would review the information and get back to her.

123.    On September 6, 2013, Jones emailed Relator, copying Khan, and informed her that he did not have time to review or deal with all the data she presented. "That is why our organizational structure is in place. In the future, please run all decisions through proper chain of command to Mohammad. He will review the matters and I am in full support of his decisions." (*See* Ex. 9, 9.6.2013 Jones Email to Flick.)

124.    On September 25, 2013, Relator received yet another email from Agendia inquiring about the still-unpaid invoice.

125.    On that same day, she emailed Agendia sales representative Mark Rayan and Renis Baker, copying Khan, informing them that Lourdes was in the process of appealing the denials of claims for the Medicare patients with the MAC responsible for Kentucky. Relator noted that, once Lourdes knew whether and how much the local MAC would reimburse for Agendia's tests on ap-

24

peal, the clause that Khan inserted would no longer be necessary. (*See* Ex. 10, 9.25.2013 Email Exchange.)

126.     Khan responded directly to Relator minutes later: "I have told you that I am dealing with them. I am surprised that you do [not] follow my instruction and you are still engage[d] in having this discussions [sic]." (*Id.*)

127.     Minutes after that, Khan sent Relator another separate email, copying Human Resources Manager Levi Loverkamp: "Effective immediately you will not be dealing with outside vendors except microbiology suppliers." (*Id.*)

128.     On October 3, 2013, Relator was suspended, pending termination, at Khan's behest for her alleged interference with the Agendia contract.  According to Khan, "the contract with Agendia is now in jeopardy as a result, in part, due to Cindy stepping outside of her scope, demonstrating behavior that could be perceived as insubordination." (*See* Ex. 11, Flick Counseling Record.)

129.     The reasons for Relator's termination were purely pretextual: she was fired in retaliation for reporting, and implicating her direct superior Kahn in, what she perceived to be violations of Medicare regulations, the Anti-Kickback Statute, and the False Claims Act.

130.     Relator does not know whether Lourdes and Agendia eventually reached an agreement on the terms of the contract, or what the final terms were.

## LEGAL CLAIMS

**1.     Violations of the False Claims Act.**

131.     The False Claims Act provides, in pertinent part, that:

(a)(1)   Any person who (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government . . . .

31 U.S.C. § 3729.

132.    As a condition of participation in Medicare, labs such as Agendia must submit a "Medicare Enrollment Application" on form CMS-855B. The application specifically requires an applicant to make the following agreement:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

133.    Medicare is not permitted to pay for any expense that is not "reasonable and necessary for the diagnosis and treatment of illness or injury." 42 U.S.C. § 1395(a)(1)(a). A claim for Medicare reimbursement of a healthcare service that is not "reasonable and necessary" is false for purposes of the False Claims Act.

134.    A claim resulting from an inducement in violation of the Anti-Kickback Statute is false for purposes of the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g).

135.    For independent laboratories, compliance with the date-of-service rules in 42 C.F.R. § 414.510 is a condition of payment by Medicare. *See* 42 C.F.R. § 415.130. Claims that are submitted in violation of the laboratory date-of-service rules are also false for purposes of the False Claims Act.

136.    Between 2009 and 2015, Agendia submitted thousands of claims that were false under the False Claims Act for at least the following reasons:

i.      Agendia submitted claims for MammaPrint to its local MAC that were not medically necessary because the physicians and hospitals ordering those tests were located in jurisdictions where MammaPrint was not reimbursable;

ii.     Agendia submitted claims for MammaPrint to its local MAC that were not medically necessary because the specimens to be tested were preserved via the FFPE method, which was not an FDA-approved means of specimen preservation until February 2015;

iii.    Agendia submitted claims for MammaPrint to its local MAC that were factually false because the date of service reported in the claims did not accurately reflect the fact that physicians had ordered MammaPrint within 14 days of patient discharge, so the date of service should have corresponded to the date of specimen collection;

iv.    Agendia submitted claims for MammaPrint to its local MAC that were legally false because Agendia fraudulently circumvented, and thus did not comply with, the laboratory date-of-service rule in 42 C.F.R. § 414.510, by instructing hospitals to artificially delay orders for MammaPrint for 14 days after patient discharge;

v.    Agendia submitted claims for MammaPrint to its local MAC that were legally false because, under the governing laboratory date-of-service rules, the claims should have been submitted by the hospitals where the specimen was collected to their local MACs;

vi.    Agendia submitted claims for MammaPrint to its local MAC that were legally false because Agendia falsely certified its compliance with applicable Medicare billing rules and the Anti-Kickback Statute;

vii.    Agendia submitted claims for MammaPrint to its local MAC that were legally false because the MammaPrint orders were induced by violations of the Anti-Kickback Statute, including Agendia's offer of free MammaPrint, BluePrint, and TargetPrint assays in exchange for doctors and hospitals using Agendia's laboratory services for Medicare patients.

137.    Agendia submitted these claims knowing that they were false because it specifically instructed doctors and hospitals to artificially delay placing orders for MammaPrint for 14 days after patient discharge, helped hospitals delay official requisitions until 14 days after discharge, and offered doctors and hospitals free MammaPrint, BluePrint, and TargetPrint assays for their cooperation.

138.    As a direct and proximate result of Agendia's submission of false claims, the United States reimbursed millions of dollars for MammaPrint under Medicare Part B. In the year 2012 alone, for example, the United States reimbursed over $3,000,000 in Agendia's false claims, some of which resulted from orders placed by doctors at Lourdes Hospital that were artificially delayed for 14 days following patient discharge.

139.    Between 2009 and 2015, Lourdes Hospital knowingly caused to be presented numerous claims that were false under the False Claims Act for at least the following reasons:

    i.    Lourdes caused Agendia to submit claims for MammaPrint to its local MAC in California that were not medically necessary because MammaPrint was not an approved test in Kentucky and likely would not have been reimbursed;

    ii.    Lourdes caused Agendia to submit claims for MammaPrint to its local MAC in California that were not medically necessary because the specimens to be tested were preserved via the FFPE method, which was not an FDA-approved means of specimen preservation until February 2015;

    iii.    Lourdes caused Agendia to submit claims for MammaPrint to its local MAC in California that were factually false because the date of service reported in the claims did not accurately reflect the fact that Lourdes physicians had ordered MammaPrint within 14 days of patient discharge, so the date of service should have corresponded to the date of specimen collection;

    iv.    Lourdes caused Agendia to submit claims for MammaPrint to its local MAC in California that were legally false because, in concert with Agendia, Lourdes fraudulently circumvented, and thus did not comply with, the laboratory date-of-service rule in 42 C.F.R. § 414.510, by artificially delaying orders for MammaPrint for 14 days after patient discharge;

    v.    Lourdes caused Agendia to submit claims for MammaPrint to its local MAC in California that were legally false because, under the governing laboratory date-of-service rules, the claims should have been submitted to Lourdes's local MAC in Kentucky;

    vi.    Lourdes caused Agendia to submit claims for MammaPrint to its local MAC in California that were legally false because Lourdes's MammaPrint orders were induced by violations of the Anti-Kickback Statute, including Agendia's offer of free MammaPrint, BluePrint, and TargetPrint assays in exchange for Lourdes's use of Agendia's laboratory services for Medicare patients, and Lourdes's solicitation of these free assays.

140.    Lourdes caused Agendia to present these claims knowing that they were false because Lourdes artificially delayed placing orders for MammaPrint for 14 after patient discharge, solicited free MammaPrint, BluePrint, and TargetPrint assays, and accepted Agendia's free assays for its cooperation.

28

141.    As a direct and proximate result of Lourdes's role in Agendia's submission of false claims, the United States reimbursed numerous claims for tens of thousands of dollars for MammaPrint under Medicare Part B.

**2.      Violations of the Anti-Kickback Statute.**

142.    The Anti-Kickback Statute makes illegal both for the following:

    (1)    whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

        (A)    in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . .

        (B)    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program

        * * *

    (2)    whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

        (A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

        (B)    to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b).

143.    Agendia violated the Anti-Kickback Statute by knowingly and willfully offering to pay remuneration to doctors and hospitals around the country, including Lourdes Hospital, in order

to induce those doctors and hospitals to order Agendia's MammaPrint assay for Medicare patients, the cost of which would be reimbursed by Agendia's local Medicare contractor.

144. Agendia's offered remuneration included the following: offering doctors and hospitals the MammaPrint assay free of charge if hospitals would delay ordering the test for 14 days following patients discharge; offering doctors and hospitals the BluePrint and TargetPrint assays free of charge if hospitals would delay ordering the test for 14 days following patients discharge; and waiving charges for MammaPrint, BluePrint, and TargetPrint even if orders for those tests were submitted within 14 days of patient discharge.

145. Lourdes Hospital violated the Anti-Kickback Statute by knowingly and willfully solicitng remuneration from Agendia in exchange for placing orders for Agendia's MammaPrint assay for Medicare patients, the cost of which would be reimbursed by Agendia's local Medicare contractor.

146. The remuneration Lourdes solicited included the following: free MammaPrint, BluePrint, and TargetPrint assays; and waived charges for MammaPrint, BluePrint, and TargetPrint even if orders for those tests were submitted within 14 days of patient discharge.

## DEMAND FOR RELIEF

147. Relator requests that this District Court enter judgment on behalf of Relator and the United States against Defendants and order the following relief:

     i.     Damages in the amount of three (3) times the actual damages suffered by the United States as a result of each Defendant's conduct;

     ii.     Civil penalties against the Defendants, respectively, for each violation of 31 U.S.C. § 3729, 42 U.S.C. § 1320a-7a, and 42 U.S.C. § 1320a-7b;

     iii.     Relator be awarded a fair and reasonable sum to which the Relator is entitled under 31 U.S.C. § 3730(b);

     iv.     Relator be awarded all costs and expenses of this litigation, including statutory attorneys' fees and court costs;

30

v.       Pre-judgment and post-judgment interest, as appropriate, at the highest rate
         allowed by law; and

vi.      All other relief on behalf of Relator or the United States Government to
         which they may be justly entitled, under law or in equity, which the District
         Court deems just and proper.

March 6, 2015

/s/ Tad Thomas

Tad Thomas (KY # 88577)
Lindsay Cordes (KY # 93775)
**Thomas Law Offices**
Kentucky Home Life Building – Suite 1800
239 South Fifth Street
Louisville, KY 40202
P: (502) 473-6540
F: (877) 955-7002
tad@tadthomas.com
Lindsay.cordes@tadthomas.com


Michael E. Klenov (*pro hac vice to be filed*)
**Korein Tillery LLC**
505 North 7th Street – Suite 3600
Saint Louis, MO 63101
P: 314-241-4844
F: 314-241-3525
mklenov@koreintillery.com

**Attorneys for Relator**

32